Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George M. Marovich | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8280 | **DATE** | 12/28/2004 |
| **CASE TITLE** | Vetter vs. Village of Oak Lawn, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER. Defendants' motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 29 2004 | 24 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | JXM | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| JD | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GERALD K. VETTER )
)
      Plaintiff, )
) No.01 C 8280
v. )
) Judge George M. Marovich
)
VILLAGE OF OAK LAWN, and )
CHIEF OF POLICE JAMES HOUK, )
DIVISION CHIEF ROBERT SMITH, )
SERGEANT WILLIAM VILLANOVA, )
and DIVISION CHIEF TERRENCE )
VORDERER, in their individual and official )
capacities, )
      Defendants. )

DOCKETED
DEC 2 9 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Gerald K. Vetter ("Vetter") filed a two-count complaint pursuant to 42 U.S.C. § 1983 asserting that defendants violated the Equal Protection Clause of the Fourteenth Amendment to the Constitution. Specifically, Vetter asserts both a "class of one" equal protection claim and a gender claim against defendants Village of Oak Lawn ("Oak Lawn"), Chief of Police James Houk ("Chief Houk"), Division Chief Robert Smith ("Division Chief Smith"), Sergeant William Villanova ("Sgt. Villanova") and Division Chief Terrence Vorderer ("Division Chief Vorderer").

Defendants filed a motion for summary judgment. For the following reasons, defendants' motion for summary judgment is granted.

## BACKGROUND

### A.   *The Oak Lawn Police Department*

Unless otherwise noted, the following facts are undisputed.[1] The plaintiff, Gerald K. Vetter, was a patrol officer with the Oak Lawn Police Department ("Oak Lawn P.D."), which is a unit of defendant Village of Oak Lawn ("Oak Lawn"). The Oak Lawn P.D. also employed defendants Chief Houk, Division Chief Smith, Sergeant Villanova and Division Chief Vorderer. Chief Houk was the Chief of Police for the Oak Lawn P.D. from 1994 to March 26, 2002. Chief Smith is the current Chief of Police. Defendant Villanova has been the Sergeant of the Village of Oak Lawn since 1999. Defendant Terrence Vorderer has been the Division Chief of the Patrol Division of the Oak Lawn P.D. since 2000 and was the Captain of the Patrol Division for five years before that.

The Oak Lawn P.D. has a policy, called General Order 85-6, for investigating complaints and disciplinary procedures. General Order 85-6 states that when a supervising officer obtains a "Complaint/Register" with a number assigned, the investigative process should be documented. The supervising officer receiving the complaint is responsible for interviewing all involved.

### B.   *Vetter releases confidential information*

In the summer of 1999, Vetter was assigned to the Tactical Unit, where Sgt. Villanova was the supervisor. Officer Tina Knepper ("Officer Knepper") was a police officer in the Patrol Division that, in April 2000, performed under-cover drug transactions for the Tactical Unit. In connection with one of her under-cover drug transactions, Officer Knepper met with drug target

---

[1] Pursuant to Local Rule 56.1, where one party supports a fact with admissible evidence and that other party denies the fact without citation to admissible evidence, the Court deems the fact admitted.

2

Jason Aleo ("Aleo"). During one of Officer Knepper's meetings with Aleo, Aleo told her that he did drugs with a Blue Island Police Officer named Officer Connors.

After the transaction and during Officer Knepper's debriefing at the tactical office, Officer Knepper informed Sgt. Villanova, Officer Glynn Brothen ("Brothen") and Vetter what the drug target had told her regarding Connors. Sgt. Villanova then informed Brothen, Vetter, and Knepper that the information could not leave the office.

Also in April 2000, Vetter and Officer Knepper attended a gang school together, and Vetter drove Officer Knepper to and from the school. On the way to gang school, Vetter called Sergeant Douglas Hoglund ("Sgt. Hoglund"), who Vetter had worked with at the Blue Island Police Department. That day, Vetter met Hoglund in a parking lot. Vetter told Sgt. Hoglund about what the drug target, Aleo, had told Officer Knepper about Officer Connors. Vetter claims that Officer Knepper also relayed the same information to Sgt. Hoglund, although Sgt. Hoglund testified that Officer Knepper said only that it was nice to meet him.

On their way back from gang school, Vetter told Officer Knepper he needed to stop by the Blue Island Police Department. Thus, Vetter and Officer Knepper arrived at the Blue Island Police Department. The parties dispute whether or not Officer Knepper objected to stopping at the Blue Island Police Department on the grounds that it would compromise her position in the drug case and possibly jeopardize her life. The parties also dispute whether or not Officer Knepper met Officer Connors while at the Blue Island Police Department, but Vetter concedes that he does not know what Officer Connors looks like.

Officer Knepper informed Brothen about her encounter with Officer Connors and told him that she was nervous about completing her last drug purchase. Officer Brothen told Officer

3

Knepper that it would be understandable if she did not want to continue the case and that he would do everything possible to ensure her safety. Officer Knepper completed the last drug purchase.

At some point, Officer Knepper conversed with Sgt. Villanova. Officer Knepper informed Sgt. Villanova she did not want to work with one of Sgt. Villanova's Tactical officers because of what had happed in April 2000. Sgt. Villanova asked Officer Knepper what had happened in April 2000. Officer Knepper informed Sgt. Villanova about the Blue Island incident. Sgt. Villanova then asked Vetter, Officer Knepper and Officer Brothen each to write him a memorandum about the Blue Island incident and asked each to state what s/he believed Sgt. Villanova's orders with respect to the incident to have been. In Vetter's memo, he stated that he had passed on Sgt. Hoglund the information about Aleo. In his memo, Vetter also apologized for disobeying and stated that it would never happen again. Neither Vetter's memo nor Officer Knepper's memo claimed that Officer Knepper had also released confidential information to Sgt. Hoglund.

Sgt. Villanova then reported Vetter's conduct to Chief Houk. Sergeant Villanova gave the memos to Chief Houk because the act of exposing an undercover officer who is in the process of making a narcotic purchase is a serious infraction and can result in suspension. On October 7, 2000, Sgt. Villanova spoke with Vetter and Brothen and advised them that he would not tolerate this type of conduct.

The parties dispute whether Vetter and Officer Knepper had had prior difficulties with one another. According to defendants, in the summer of 1999 and again in the summer of 2000, Vetter made advances towards Officer Knepper while she was married. Officer Knepper states that both times she rejected Vetter's advances. Vetter, on the other hand, claims that he did not make any advances.

4

### C.    Officer Knepper's sick day

On September 18, 2000, Officer Knepper called in sick for the first time in nearly two years. Officer Knepper's supervisor at the time was Vetter's father, Gerald D. Vetter. Officer Knepper believed that Vetter's father and Lieutenant Raspovich ("Raspovich") subjected her to undue scrutiny in a meeting about her sick day. After that, Officer Knepper spoke to the union representative, Officer Patrick Barron ("Barron"), about the scrutiny from Vetter's father and Raspovich and told Barron the undue scrutiny was because she rejected his son's advances. (Ultimately, Officer Knepper decided not to file a formal sexual harassment complaint because she did not consider the conduct serious enough.) On October 6, 2000, Officer Knepper met with, among others, Barron, Chief Houk and Chief Vorderer. At the meeting, Officer Knepper was questioned about, among other things, her use of the sick day. Ultimately, Chief Houk informed the others that the sick day issue had been pursued too far and that because Officer Knepper she was not a sick time abuser, she should not be fired or suspended.

### D.    Vetter's problems with Officer Mainwaring

In May 2000, Officer Darin Mainwaring ("Mainwaring") was assigned to the Tactical Unit. Sgt. Villanova observed a conflict between Vetter and Mainwaring. Sgt. Villanova believed that the conflict was caused by Mainwaring's rumored romantic involvement with Officer Knepper. In July 2000, Sgt. Villanova separately informed both Vetter and Mainwaring that it was important for the Tactical Unit that they get along. Sgt. Villanova also informed them that if they could not get along, one or both of them would be transferred out of the Unit. The Tactical Unit affords more opportunities than working in the Patrol Division. Tactical Unit officers are considered detectives and receive (a) an additional eight hours (approximately) of paid time per month; (b) a take-home car; and (c) permission to wear civilian clothing.

In a follow-up conversation on October 14, 2000, Sgt. Villanova again advised Vetter that if he did not resolve conflicts between himself and Mainwaring, one or both of them would be transferred out of the Tactical Unit. Mainwaring had accused Vetter of interfering with his informants, lying behind his back, dating his ex-girlfriends, and sabotaging his cases. On October 17, 2000, Sgt. Villanova spoke to Mainwaring, and Mainwaring stated he wanted to resolve the problem with Vetter. Mainwaring informed Sgt. Villanova that Vetter refused to talk to him.

### E. *The events leading to Vetter's resignation from the tactical unit*

On October 19, 2000, Sgt. Villanova drafted a memo to Division Chief Smith recommending that Vetter be transferred to the Patrol Division because: (1) Vetter compromised Officer Knepper's safety; and (2) Vetter refused to resolve the personal issues between himself and Mainwaring. Sgt. Villanova did not give the memo to Chief Smith

Separately, Division Chief Smith met with Mainwaring to discuss the conflict between him and Vetter. Division Chief Smith informed Mainwaring that the nature of the work in the Tactical Unit made it imperative they get along. Division Chief Smith also reminded Mainwaring that if he and Vetter did not get along, one or both would be transferred down to the Patrol Division. Shortly after speaking with Mainwaring about getting along with Vetter, Division Chief Smith called Mainwaring and informed him that Mainwaring would be transferred.

In October 2000, Vetter (who had requested the meeting) met with Sgt. Villanova, Division Chief Smith and Chief of Police Houk. According to defendants, at the meeting, Vetter stated that he would agree to be transferred back to the Patrol Division. Vetter contends that Chief Houk forced him to resign because, if he did not, Houk was going to "boot" Vetter out and ruin his career. The parties agree that Vetter submitted a letter requesting that he be transferred to the Patrol

6

Division. After Vetter submitted his resignation letter, Division Chief Smith informed Mainwaring that he could stay in the Tactical Unit.

## DISCUSSION

I. <u>Standard for Motion for Summary Judgment</u>

Summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). When making such a determination, the court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *See also Courtney v. Biosound*, 42 F.3d 414, 418 (7th Cir. 1994).

II. <u>Equal Protection Claims</u>

A. <u>Class of "One"</u>

The Fourteenth Amendment to the Constitution provides, in relevant part, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." Pursuant to 42 U.S.C. § 1983, individuals have a private right of action for violations of the Fourteenth Amendment. Typically, a plaintiff alleges an equal protection claim by alleging disparate treatment based on membership in a protected class, such as race, gender or religion. *See McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 n. 3 (7th Cir. 2004). Alternatively, an individual can bring an equal protection claim as a member of a "class of one." *Id.* at 1001. To

prevail on an equal protection claim based on a class of one, one must establish: (1) that "he has been intentionally treated differently from others similarly situated"; and (2) that "there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant." *McDonald*, 371 F.3d at 1001. In the employment context, an employee must establish that he is similarly situated with persons outside of the protected class (or outside the class of one) in performance, qualifications and conduct. *McDonald*, 371 F. 3d at 1002. The Seventh Circuit has explained the particular importance of the similarly situated individual in the "class of one" context:

> Every time an actor commits a tort, he may be treating the victim differently than he frequently treats others, simply because tortious conduct is by nature a departure from some norm. Nonetheless, the purpose of entertaining a 'class of one' equal protection claim is not to constitutionalize all tort law nor to transform every claim for improper provision of municipal services or for improper conduct of an investigation in connection with the into a federal case. ... Therefore, we believe a meaningful application of the 'similarly situated' requirement is important to avoiding a distortion of the scope of the protection in 'class of one' equal protection claims.

*McDonald*, 371 F.3d at 1009.

In this case, Vetter claims he was treated differently in two respects: (1) that the Oak Lawn P.D. failed to follow General Order 85-6 with respect to Vetter; (2) that Vetter was forced to resign from the tactical unit, while Knepper and Mainwaring were treated more favorably.

   *1. Oak Lawn's alleged failure to follow General Order 85-6*

Vetter contends that Oak Lawn failed to follow General Order 85-6, its policy on internal investigations. General Order 85-6 requires that after a complaint is filed, Oak Lawn must investigate. Perhaps Oak Lawn did not follow General Order 85-6, but that is not a federal cause of action. Vetter's claim is a violation of equal protection, but Vetter fails to put forth sufficient evidence from which a reasonable juror could conclude that he was treated differently from a

8

similarly situated individual. Here, although Sgt. Villanova did not conduct a full investigation under General Order 85-6, he treated each individual—Knepper, Brothen and Villanova—the same. Sgt. Villanova began the investigation process by demanding memos from each officer involved. The memos afforded each officer the same opportunity to explain their side of what took place after Sgt. Villanova gave his order. Vetter has failed to put forth evidence that defendants followed General Order 85-6 more closely with respect to similarly situated individuals. Accordingly, Vetter has not established an equal protection violation.

### 2. *Vetter's resignation*

Next, Vetter claims that he was forced to resign from the tactical unit under duress because the defendants threatened to "boot" him from the Unit and ruin his career if he did not resign. For their part, defendants contend that they did not force him to resign. Even assuming that a jury accepts Vetter's version, he still has not put forth sufficient evidence to survive a motion for summary judgment.

Vetter claims that two individuals were similarly situated and were treated more favorably in that they were not forced to resign. First, Vetter argues that Mainwaring was similarly situated to him. Although Vetter and Mainwaring have some similarities (they both worked together, did not get along, and were told to work out their problems or risk being transferred), they are different with respect to conduct. Vetter admitted to having disclosed information Sgt. Villanova ordered kept confidential. Vetter thus compromised Officer Knepper's safety. Vetter has produced no evidence that Mainwaring violated a similar order or compromised another officer's safety. Therefore, Vetter and Mainwaring are not similarly situated.

The second individual to whom Vetter compares himself is Officer Knepper, who is more similarly situated to Vetter than was Mainwaring. Vetter asserts that like him, Officer Knepper

9

disclosed confidential information to Sgt. Hoglund in violation of Sgt. Villanova's order. Although Officer Knepper and Sgt. Hoglund deny that Knepper shared the information with Sgt. Hoglund (and although Vetter never mentioned this detail while he still worked for Oak Lawn P.D.), his evidence could convince a reasonable jury to conclude that Officer Knepper and Sgt. Villanova were similarly situated.

Vetter's equal protection claim still fails, however, because he has not put forth sufficient evidence from which a reasonable jury could conclude that defendants had no reasonable basis for the difference in treatment or that they acted with a "totally illegitimate animus" toward Vetter. To the contrary, Vetter has put forth no evidence that anyone at the Oak Lawn P.D. ever knew before his forced resignation that Officer Knepper also disclosed confidential information. When Vetter wrote his memo to Sgt. Villanova, he never mentioned that Officer Knepper disclosed confidential information. Nor did Officer Knepper ever state that she released confidential information. Accordingly, it was entirely reasonable for defendants to treat Vetter differently than Officer Knepper: they had no idea that Vetter claimed Officer Knepper had also released confidential information. Defendants' actions are also rational because Vetter had not been getting along with Mainwaring, and the Chief had concluded that one of them needed to be transferred to the patrol unit.

Finally, Vetter fails to put forth sufficient evidence that defendants' actions were caused by a "totally illegitimate animus" toward Vetter. A forced resignation can be as consistent with generosity as with animosity because a resignation generally looks better than a demotion or termination in the eyes of future employers. Furthermore, any animosity was not illegitimate, but rather was the legitimate result of Vetter's admitted release of confidential information in violation of a direct order and which compromised the safety of another officer.

10

Defendants are entitled to summary judgment on Vetter's "class of one" equal protection claim.

B.   Gender claim

Vetter's also asserts a claim for denial of equal protection based on gender, although he barely makes any mention of this claim in any of his briefs or subsequent filings with this Court. The same standards applicable to Title VII claims for gender discrimination are also applicable to § 1983 equal protection claims based on gender. *Williams v. Senriff*, 342 F.3d 774, 788 & 791 (7th Cir. 2003). In the absence of direct evidence of gender discrimination, a plaintiff may use the indirect, *McDonnell Douglas* burden-shifting method. *Sartor v. Spherion Corp.*, 388 F.3d 275, 278 (7th Cir. 2004). First, a plaintiff must establish a *prima facie* case of discrimination by putting forth evidence that: (1) he is a member of a protected class; (2) that he was performing his job satisfactorily; (3) that he was the object of a materially adverse employment action; and (4) the similarly-situated employees outside the protected class were treated more favorably. *Sartor*, 388 F.3d at 279. If the plaintiff makes out a *prima facie* case of discrimination, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the action. Then, the burden shifts back to the plaintiff to establish that the reason is a mere pretext for discrimination. *Sartor*, 388 F.3d at 279.

Vetter does not bother to (and cannot in any case) make out a *prima facie* case of gender discrimination. In their motion for summary judgment, defendants note that in plaintiff's complaint, he alleged that Officer Knepper was similarly-situated to Vetter in that she had violated a rule (against the misuse of sick time) but had been treated more favorably. Defendants argue that Vetter is not similarly-situated to Officer Knepper for purposes of making out a *prima facie* case of discrimination, because Knepper's conduct was far less egregious than Vetter's. Specifically,

11

Officer Knepper was questioned about the misuse of a sick day while Vetter admitted in writing that he had disclosed information Sgt. Villanova had ordered should be kept secret. No reasonable jury could conclude that Officer Knepper's conduct was similar to Vetter's. Furthermore, Vetter has not established the he was performing his job satisfactorily because he failed to get along well with Mainwaring and compromised Officer Knepper's safety. For his part, Vetter did not so much as respond to defendants' motion for summary judgment on his gender discrimination claim. Vetter fails to make out a *prima facie* case of gender discrimination, and defendants are entitled to summary judgment on Vetter's gender discrimination claim.

Accordingly, the Court grants defendants' motion for summary judgment on Vetter's § 1983 claim for gender discrimination.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted.

ENTER:

George M. Marovich
United States District Judge

DATED: December 28, 2004